875 Park Avenue Co. v. Commissioner.
875 Park Ave. Co. v. Commissioner
Docket No. 39111.
United States Tax Court
1953 Tax Ct. Memo LEXIS 92; 12 T.C.M. (CCH) 1157; T.C.M. (RIA) 53330; October 9, 1953
*92 Although the apartment house which was the principal asset of a corporation was lost through foreclosure sale in 1945, the corporate stock did not become worthless in that year since other assets exceeded liabilities at the close of the year notwithstanding certain unsettled claims against the corporation. Aaron Holman, Esq., and I. Newton Brozan, Esq., 25 Broadway, New York, N. Y., for the petitioner. John A. Clark, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This action is brought to test the correctness of respondent's determination of a deficiency of $39,562.57 in the income tax of petitioner for the year 1945. The sole issue for decision is whether certain shares of stock owned by petitioner's subsidiary became worthless in 1945. Those facts which were stipulated are incorporated herein by reference. Findings of Fact Petitioner is a corporation organized under the laws of the State of New York with its principal office in New York City. Throughout the period here in question, petitioner owned all of the issued and outstanding shares of stock of 1040 Park Avenue Corporation, hereinafter called the subsidiary, and filed *93 a consolidated income tax return with the subsidiary for the year 1945 with the collector of internal revenue for the second district of New York. In 1923 the subsidiary purchased certain parcels of real estate at 86th Street and Park Avenue in New York City and commenced the erection thereon of an apartment house known as 1040 Park Avenue, which was completed in 1924. The subsidiary caused a corporation known as Park Avenue & 86th Street Corporation, hereinafter called the operating company, to be organized under the laws of the State of New York and conveyed the property to it in 1924 for the purpose of operating the property as a "cooperative" apartment house. The operating company purchased the property from the subsidiary for the sum of $2,510,200 by taking the property subject to a mortgage in the amount of $410,000, agreeing to pay $715,000 in cash, and by issuing to the subsidiary all of the 13,852 shares of its common stock, having a par value of $100 per share, for a total par value of $1,385,200. These shares entitled the owners thereof to proprietary leases in specified apartments in the building for a five-year term with provision for 19 similar renewal periods. The *94 building had 44 separate apartments. Immediately after receiving the 13,852 shares, the subsidiary proceeded to offer them and the apartments represented thereby for sale to the general public for occupancy. From time to time commencing with the year 1924, it sold 26 of the apartments, plus eight servants' rooms, representing a total of 7,873 shares. Being unable to sell the remaining 18 apartments representing a total of 5,979 shares, it leased those apartments commencing with the year 1925. The operating company was on a fiscal year basis ending September 30th. At the end of each fiscal year, the managing agents of the apartment house prepared a proposed budget of the estimated expenses for maintenance and operation of the premises for the next ensuing fiscal year. Upon adoption of the budget by the operating company's board of directors, a notice of the pro rata amount allocable to each share of stock was sent to the owner of each apartment for payment in 12 equal monthly installments during the next fiscal period. The amount of the annual budget was computed so as to include only expected expenses for the ensuing year. If an appreciable balance remained at the end of any year, *95 the excess was taken into account in fixing the budget for the following year. During the period from 1933 to 1943, inclusive, some of the tenant-owners of apartments surendered their shares of stock and apartments to the operating company. During that period, the subsidiary surrendered three apartments and the shares pertaining thereto totaling 1,145 shares of stock, leaving it still the owner of 15 apartments representing 4,834 shares in the taxable year here involved. Each of those 4,834 shares had a cost basis to the subsidiary in 1945 of $44.05, or a total cost basis of $212,937.70. When the operating company acquired the property from the subsidiary, it took title subject to a mortgage in the amount of $410,000 held by the Central Union Trust Company of New York and immediately executed an additional mortgage to that bank for $715,000, both mortgages being consolidated into a single mortgage in the amount of $1,125,000, bearing interest at five per cent per annum, payable semiannually, with amortization payments of $6,000. That mortgage was assigned to the Union Dime Savings Bank, hereinafter called the Bank, on October 31, 1930. On November 1, 1943, when the principal amount *96 of the mortgage indebtedness was $1,015,446.14, the operating company was in default to the Bank for non-payment of a balance of interest of $5,088.42 which became due on August 1, 1943, and interest of $10,154.46 due on November 1, 1943. On March 14, 1944, the Bank commenced action in the Supreme Court of the State of New York, County of New York, to foreclose the mortgage because of the default and joined as parties defendant the operating company and each of the owners of apartments in the building, including the subsidiary as well as lessees of other apartments. A receiver of the property was appointed by the Supreme Court on March 15, 1944, and he promptly entered into possession. When the proprietary leases held by each stockholder expired on September 30, 1944, the receiver entered into one-year leases with the occupants of apartments pursuant to orders of the Supreme Court. Thereafter, on March 30, 1945, a judgment dated March 6, 1945, of foreclosure and sale of the property was entered, wherein the Court found that the sum of $1,100,540.39 was due and owing to the Bank as mortgagee, with interest from February 2, 1945, and wherein a referee was designated to sell the premises. *97 At the foreclosure sale on May 16, 1945, the Bank bid the property in for the sum of $500 and on May 23, 1945, the referee executed and delivered to the Bank a deed of conveyance of the property. The aforementioned judgment forever barred and foreclosed the subsidiary and all other owners of apartments and tenants in the premises of all right, title, interest and equity of redemption in the premises as of March 6, 1945. On July 9, 1945, the Bank made a motion for an order (1) confirming the referee's report of sale; (2) referring to an official referee of the Court the question of the fair and reasonable value of the foreclosed property on the day of the sale, and (3) determining the amount of any deficiency judgment in favor of the plaintiff and directing the entry thereof. On September 25, 1945, an order was made and entered confirming the report of the foreclosure sale and appointing a referee to hear and report as to the "fair and reasonable market value of the mortgaged premises" on the day of the sale. The operating company actively participated in the hearings as to the fair market value, employing a real estate expert to testify in its behalf. The motion was still pending *98 as of December 31, 1945. The referee rendered his report dated April 25, 1946, in which he found that "the fair and reasonable market value of the property as of the date of the sale was $1,150,000." On May 9, 1946, the Supreme Court entered an order confirming the referee's report and denying any deficiency judgment in favor of the Bank and against the operating company. After the foreclosure sale in May, 1945, officials of the Bank offered to sell the property back to the subsidiary or its stockholders for $700,000. Following its purchase of the property at foreclosure, the Bank distributed circulars in which it offered the property for sale at a price of $850,000. On October 30, 1945, the Bank sold the premises for $700,000 to the Hopewell Holding Corporation, a company which was in no way affiliated with the Bank. The selling price was 58.33 per cent of the assessed valuation of the property in that year. Sales of 27 other properties along Park Avenue in New York City within the vicinity of the operating company's property were at prices averaging 51.31 per cent of their assessed valuation. As of December 31, 1945, the books of the operating company showed the following assets *99 and liabilities: Assets
Cash in Bank
$ 4,285.77
Accounts Receivable: 1040 Park Avenue Corporation - Mainte-
nance
$32,947.09
Rentals Due from Tenants
1,714.35
34,661.44
Prepaid and Deferred Charges: Insurance
1,228.32
New York State Franchise Tax
48.96
1,277.28
Due from Brown, Wheelock Harris, Stevens, Inc. (Ear-
marked to Cover Gratuity Fund)
768.01
Total Assets
$40,992.50
$40,992.50
Liabilities
Employees Gratuity Fund
768.01
Total Liabilities
768.01
Excess of Assets Over Liabilities
$40,224.49
At the time of the appointment of the receiver on March 15, 1944, assessments in the amount of $32,947.09 were outstanding against the subsidiary for maintenance charges on the apartments which it owned, which item appears as an asset on the operating company's balance sheet. The receiver of the premises, claiming that this amount was due him rather than to the operating company, brought suit against the subsidiary in the Supreme Court of the State of New York, County of New York, on October 30, 1944, to recover that sum. His claim was based on the directions contained in the order of the Supreme Court appointing him *100 receiver, as follows: "That said Receiver be, and he hereby is, directed to demand, collect and receive from the tenant, or tenants, now or hereafter in possession of said premises, or other persons liable therefor, all the rents thereof, now due and unpaid, or hereafter to become due. "That the tenants in possession of said premises, and such other person or persons, as may be in possession thereof, be and they are hereby directed to attorn as such tenant or tenants to said Receiver, and until the further order of this Court to pay over to said Receiver all rents of said premises now due and unpaid, or that may hereafter become due. "That all tenants of the premises, and all other persons liable for the payment of the rents thereof, are hereby enjoined and restrained from paying any rent for such premises to the defendants, their agents, servants or attorneys." The subsidiary actively defended the suit by the receiver contending that it did not owe the $32,947.09 to the Bank by reason of an oral agreement which it alleged the operating company had entered into with the Bank whereby the operating company agreed to pay to the Bank the net amount remaining from rents accruing *101 after February 1, 1943, after paying the operating expenses of the premises in consideration for the Bank's agreement not to seek any recourse to any of the rents or charges in the nature of rents which had accrued prior to February 1, 1943, from stockholderlessees. That case was finally settled on February 13, 1948. The stipulation of settlement provided that the subsidiary pay the receiver $4,742.61 in full settlement of his claim. The subsidiary settled the balance of the $32,947.09 claim by paying $21,165.81 to the operating company on April 7, 1948. On June 8, 1948, the operating company was dissolved by the filing of a certificate of dissolution with the Secretary of State of New York. The balance of cash on hand after payment of dissolution expenses and attorneys' fees was $28,619.99. During the year 1948, this sum was distributed in complete liquidation to the stockholders of the operating company who had owned apartments as of September 30, 1943, represented by 8,646 shares having an aggregate par value of $838,100. The subsidiary, as the owner of 5,099 shares, received a distribution of $16,878.69. From September 30, 1945 until the time of dissolution, the operating company *102 engaged in no business activities. The corporation was kept alive solely to await the outcome of the action by the receiver against the subsidiary. The subsidiary's shares of stock in the operating company and the leaseholds represented thereby were assets held by the subsidiary in the ordinary course of business. The book value of 8,646 shares outstanding on December 31, 1945, was $4.65 per share. Disregarding as an asset the $32,947.09 claimed by the receiver, the par value was 84 cents per share. As of December 31, 1945, the operating company had assets in excess of liabilities. The stock of the Park Avenue & 86th Street Corporation did not become worthless in 1945. Opinion ARUNDELL, Judge: Respondent, having determined the stock of the operating company had liquidating value as of December 31, 1945, disallowed the deduction sought by the petitioner for the alleged worthlessness of the stock in that year. The record discloses that although the apartment house, which was the principal asset of the operating company, was lost by foreclosure during the year in question, the corporate books showed other assets in excess of liabilities by $40,224.49 as of the end of that *103 year. Petitioner takes the position that the assets as set forth on the books do not accurately reflect the true fair market value as of December 31, 1945. It points out that the principal remaining asset was an account receivable from the subsidiary in the amount of $32,947.09 and that since the receiver of the operating company had brought suit for that sum against the subsidiary, it should not be considered as an asset. We think there is no merit in this contention. The validity of the receiver's claim to the account receivable was not established in 1945 or, indeed, at any time, the suit being settled some years later for a fraction of the original claim. Moreover, the suit by the receiver was actively defended by the subsidiary on the basis of an agreement between the operating company and the mortgagee-purchaser. Petitioner further argues that the remaining assets of the operating company were valueless at December 31, 1945, by reason of an anticipated deficiency judgment in favor of the mortgagee. * In support of that contention, petitioner points out that after buying in the apartment house at the foreclosure sale, the Bank repeatedly offered it for sale at prices ranging *104 from $700,000 to $850,000, finally selling it for $700,000, while the mortgage exceeded $1,000,000. Our discussion with regard to the conjectural nature of the liability created by the receiver's suit against the subsidiary applies with equal force to this contention. The fair market value of the realty was not determined until a later year and the decision then was that the value of the realty exceeded the mortgage debt so that no deficiency judgment was ever entered. The motion for deficiency judgment was actively opposed by the operating company, which produced a real estate expert as a witness on its behalf. While the possibility of losing part or even all of the remaining assets at some future time might well have had some effect on their value, we think there is no justification for considering them valueless during the pendency of contested litigation. It is well established that mere shrinkage in the value of securities does not result in deductible losses. * * * mere depreciation in the value of stock, even to almost the vanishing point, does not entitle a taxpayer to take a deduction of his investment therein. This is permissible only when the stock has become entirely *105 worthless * * *. ; cf. ; . Petitioner cites the case of , in which the taxpayer sought to deduct in 1943 the cost of stock in a corporation operating a cooperative apartment house which was foreclosed in 1943, the corporation being dissolved in 1944. Although the Court decided the question of deductibility without deciding the year of worthlessness, it indicated by way of dicta that it was inclined to agree that the stock became worthless in the year of foreclosure. There was nothing in that case, however, to indicate that the corporation had assets other than the apartment house as is the case in the question at bar. It follows that respondent correctly disallowed any deduction for the worthlessness of the stock in 1945. Decision will be entered under Rule 50.